# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Bruce Hampton                                   Civil No. 18-541 (DWF/TNL)

        Plaintiff,

v.                                              **MEMORANDUM**
                                                **OPINION AND ORDER**

Michael Kohler

        Defendant.

_____

Brain W. Varland, Esq., Donald R. McNeil, Esq., and David K. Snyder, Esq., Heley, Duncan & Melander, PLLP, counsel for Plaintiff.

Christopher J. Harristhal, Esq., and John Anders Kvinge, Esq., Larkin Hoffman Daly & Lindgren, Ltd., counsel for Defendant.

_____

## INTRODUCTION

This is a contract dispute over whether Defendant Michael Kohler ("Kohler") breached an Agreement with Respect to Post-Closing Amounts by refusing to distribute a pro-rata portion of post-closing amounts promised to Plaintiff Bruce Hampton ("Hampton"). The pro-rata payment was conditioned upon Hampton's employment at the time of distribution. The parties dispute whether Hampton met the condition of employment during the relevant time. The Court now considers Kohler's motion for summary judgment on Hampton's remaining breach of contract claim. (Doc. No. [37].) For the reasons set forth below, the Court grants the motion.

# BACKGROUND

Hampton alleges one count of Breach of Contract. (Doc. No. 1, Ex. 1 ("Compl.".) The basis of the lawsuit involves an Employment Agreement (Doc. No. 53-1, ("Hampton Aff.") ¶ 2 ("Employment Agreement")) and Restricted Stock Agreement Under the Milestone Systems, Inc. Stock Incentive Plan (Hampton Aff. ¶ 3 ("Restricted Stock Agreement") signed by the parties in September 2002. (Compl. ¶ 5.) Kohler was the president of Milestone Systems at that time. (*Id.*) The Restricted Stock Agreement awarded Hampton 760 shares of restricted Series B stock in the company. (*Id.* ¶ 6.) In 2005, an amendment to the Restricted Stock Agreement increased Hampton's total shares to 1,465. (*Id.* ¶ 8.)

In April 2016, Milestone Systems' shares were sold to Kudelski Security, Inc. ("Kudelski"). (Doc. No. 52, ("Pl. Memo.") at 3.) In the leadup to closing, on or around April 29, 2016, Hampton and Milestone, along with other employees, executed a Termination and Release Agreement (Hampton Aff. ¶ 6 ("Termination and Release")) which was signed by Hampton and Mark Greer, Milestone's then-president. (Compl. ¶ 9.) Hampton alleges that the Termination and Release was presented to him the same day he signed it and that he was told he would be fired if he refused to sign. (Pl. Memo at 4.) The Termination and Release superseded the employees' respective restricted stock agreements but promised that the company would pay each the amounts that would otherwise have been payable to them at the closing. (Termination and Release § 9.) On or about that same date, Hampton and Kohler executed an Agreement with Respect to Post-Closing Amounts (Hampton Aff. ¶ 6 ("Post-Closing Agreement")), pursuant to

which Kohler would pay Hampton his individual pro-rata portion of all post-closing amounts. (Compl. ¶¶ 11, 12.) According to a letter Hampton received prior to closing from the accounting firm that calculated closing amounts (Hampton Aff. ¶ 5 ("Krier Letter")), a sum of $4,000,000 was set aside for escrow. (Compl. ¶ 10.) Hampton was due an employee payout at closing totaling $1,368,641 based on his 1,465 unvested shares. (Krier Letter.) If the full escrow was collected, Hampton's shares would entitle him to an additional $164,903, to be disbursed on November 14, 2017. (*Id.*; Compl. ¶ 10; Pl. Memo at 10.) Section 3 of the Post-Closing Agreement, "Payment Conditioned on Employment," provides:

> In order for an Employee to receive its pro rata portion of the Post-Closing Amounts, the Employee must be employed by the Company at the time of payment. Notwithstanding the foregoing, however, an Employee remains eligible to receive its pro rata portion of the Post-Closing Amounts (if any) if the Company terminates the Employee's employment without cause (as described in Employee's employment agreement).

Post-Closing Agreement § 3. In turn, the 2002 Employment Agreement states, in a paragraph entitled "Termination," that the Employment Agreement may be terminated "[u]pon the expiration of thirty (30) days following the date on which MILESTONE or Employee shall give to the other written notice of intention to terminate without cause," reserving the right to the company to provide thirty days' pay in lieu of the notice required. (Employment Agreement § 16(b).) The other subparagraphs under the "Termination" heading address situations involving mutual consent between the parties, uncured breach committed by Hampton, termination for cause as determined by the

company, and termination in the case of Hampton's death. (*Id.* §§ 16(a), (c)-(e).) The term "termination" is not defined anywhere within the Employment Agreement.

Kudelski announced its acquisition of Milestone on May 3, 2016. (Compl. ¶ 14.) Hampton alleges that on July 18, 2016, he was informed that he was being reassigned from his Milestone position in management to that of an individual contributor within Kudelski, which would require international travel for extended periods. (Hampton Aff. ¶ 9.) The next day, July 19, Hampton expressed his dissatisfaction with the change in working conditions to Kudelski's chief operating officer, Steve Speidel ("Speidel"). (Hampton Aff. ¶ 10.) Hampton told Speidel that for him to "take on responsibilities that required frequent and extended travel was not a good option" for him at that time due to family obligations. (*Id.*) Speidel told Hampton he would discuss the matter with Kudelski's chief executive officer, Rich Fennessy, and both would meet with Hampton the following day. (*Id.*) In the course of the July 20 meeting, Hampton alleges, he "was informed that Kudelski was going to terminate [his] position at the end of February" following the renewal of an account that Hampton worked on with a major customer, but in light of Hampton's concerns, "they would terminate [his] position sooner than later" and "get back to [him]." (*Id.* ¶ 11.)

On August 9, 2016, Kudelski presented Hampton with a Confidential Separation Agreement by e-mail. (Hampton Aff. ¶ 12.) That same day, Hampton responded through e-mail to Speidel, asking for contact information so that his attorney could communicate with the attorney "the company is using to put this together." (*Id.*) On August 26, 2016, Fennessy e-mailed Hampton for his approval of a draft of an announcement to be issued

4

to the company about Hampton's upcoming departure, which stated that as of September 30 that year, Hampton would be "retiring from Kudelski" and while Fennessy was "disappointed that [Hampton] will be retiring . . . [he] wish[ed] him all the best." (Hampton Aff. ¶ 17.) The announcement further stated that after September 30, Hampton would continue to be available to the company and its clients "on a consultancy basis." (*Id.*) Hampton had no objections to the wording of the announcement. (Doc. No. 40, ("Harristhal Decl."), ¶ 8 ("Hampton Dep.") at 49.) On August 31, 2016, then-president Greer sent an e-mail to Kohler, noting that it was Greer's last day with the company and mentioning that Hampton was "also leaving [Kudelski]." (Hampton Aff. ¶ 17.) Greer reported that over the previous 45 days, Hampton "made it very clear" to Greer that he wanted out of Kudelski, and that he wanted to be "terminated/released [without] cause due to the significant financial implications." (*Id.*) Over the course of their "numerous verbal discussions," Hampton communicated to Greer that if Kudelski did not release him without cause, Hampton would still leave but "could end up working for a competitor" and could work hard to move the business with their major customer away from Kudelski. (*Id.*) Greer told Kohler he had passed this information on to Kudelski management, and that Hampton would be receiving a package "richer" than that given to Mark Thompson at his separation, including termination without cause, payout of all vacation, all earned and unearned bonuses, and three months' payment of premiums to continue his health insurance. (*Id.*)

The parties' respective counsel "worked amicably" together to draft a final separation agreement and consulting agreement, signed by Hampton on August 26, 2016

to be effective September 30, 2016.  (Hampton Aff. ¶¶ 14-15; Doc. No. 56 ("Separation Agreement"); Doc. No. 57 ("Consulting Agreement").)  Hampton concedes that Kudelski did not "in any way mandate" that his employment end in 2016, and that he was not "forced to sign" the Separation Agreement, which terminated his previous Employment Agreement and set forth new terms.  (Hampton Dep. at 50.)

Specifically, the Separation Agreement states that "Kudelski wishes to reach an amicable separation with [Hampton] and assist [Hampton's] transition to other employment," and that "[t]he parties' separation is without cause by either party." (Separation Agreement ¶¶ A-B.)  Under the agreed terms, Hampton would be provided a severance payment of $37,500, which would constitute "adequate legal consideration for the promises and representations made by [Hampton]" in the contract.  (*Id.* § 1.) Kudelski would also provide premiums for three months of Hampton's health and dental benefits, his usual salary and bonuses until the date of separation, additional bonuses for transactions completed before the separation date, yet another bonus for successful renewal of the major account expected to occur on or around the separation date, expense reimbursement, and pay for all earned and unused vacation or paid time off.  (*Id.* §§ 2-3.) Hampton agreed to make himself available through at least April 30, 2017 to provide services to Kudelski pursuant to the attached Independent Consultant General Services Agreement for compensation of $200 per hour plus expenses, if the work was done locally, or $1,600 per day plus expenses if travel outside of the Twin Cities metro area would be required.  (*Id.* § 4.)  Hampton also was eligible for a $50,000 "Special Bonus"

based on Kudelski's assessment of Hampton's "positive impact" on securing renewal of the account with the company's major customer.  (*Id.*)

The Separation Agreement also reinforced Hampton's obligations of non-competition with Kudelski after the end of his employment.  Under Section 11, which addresses "Covenants of Non-Competition and Non-Solicitation," Hampton agreed that for the ensuing year, he would not seek business, accept business, or interfere in Kudelski's relationship with any of several listed clients, including the major customer that had been the focus of discussion between the parties.  (*Id.* § 11.1.)  Hampton also agreed not to take any action to draw away any current Kudelski or client employees. (*Id.* §§ 11.2; 11.4.)  These clauses replaced Hampton's prior obligations under the Employment Agreement, which stated its covenant not to compete broadly, but required that Hampton refrain from providing services similar to his employer's in Minnesota and surrounding states. (*Id.* § 11.3; Employment Agreement § 6.)

Hampton requested that his portion of the escrow funds be paid to his newly established business in a letter to Kohler dated October 27, 2017.  (Hampton Aff. ¶ 20.) An attorney for Kohler responded in a letter dated November 17, 2017, informing Hampton that Kohler received the escrow funds the week before and disbursed funds on November 16 to those individuals who had satisfied the conditions and requirements of their respective post-closing agreements.  (Hampton Aff. ¶ 20.)  According to his counsel, Kohler determined that Hampton failed to meet the terms of his Post-Closing Agreement because he was not then employed by Kudelski and had negotiated his separation, "thereby constituting a resignation," and therefore had not been terminated

without cause. (*Id.*) Hampton did not receive his pro-rata payment under the Post-Closing Agreement.

Hamptons contends that his employment was terminated by Kudelski without cause, stating that "[i]f [he] had wanted to resign, [he] would have done so," that he wanted to continue working with Kudelski, and that he was "happy" with his new position as Chief Technical Architect. (Hampton Aff. ¶ 11.) Kohler points to the negotiations between Hampton and Kudelski over the terms and conditions of their formal separation to show that their separation was the result of mutual agreement. Kohler further claims that Hampton told Kudelski leadership in July and August of 2016 that he wanted to end his employment and "wanted nothing to do with Kudelski going forward," and notified them through his counsel that he considered his non-compete obligations "unenforceable due to lack of consideration," leading them to feel "at risk that Hampton could negatively impact a relationship with a major customer." (Doc. No. 39 at 6.)

Hampton commenced this action on January 30, 2018, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. (Compl.) The case was originally filed in state court and removed to this Court based on diversity jurisdiction. (Doc. No. 1 ¶ 4.) This Court dismissed Count Three, Hampton's claim for unjust enrichment, with prejudice on June 21, 2018. (Doc. No. 18.) Count Two, alleging breach of implied covenant of good faith and fair dealing, was dismissed with prejudice on January 7, 2019. (Doc. No. 35.) For the remaining count of his complaint, Hampton seeks judgment in the amount of $158,966.16, the amount he would

have been eligible to receive as his share of the escrow funds released in November 2017, plus interest.  (Hampton Aff. ¶ 22.)  Kohler now moves for summary judgment as to Hampton's remaining claim for breach of contract pursuant to Federal Rule of Civil Procedure 56(a).

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Breach of Contract

Because jurisdiction in this matter derives from diversity, this Court must apply state substantive law and "attempt to predict how the highest court would resolve the issue" when faced with issues not yet decided by the Minnesota Supreme Court. *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 98th Cir. 2010); *accord Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014).  Under Minnesota law, the elements of a breach of contract claim are: "'(1) formation of a contract; (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant; and (3) breach of contract by defendant.'" *Carlsen v. Game Stop, Inc.*, 833 F.3d 903, 911 (8th Cir. 2016) (*quoting Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)).  To prevail on a claim of breach of contract, a plaintiff must prove the requisite three elements plus damages.  *MSK Eyes Ltd. v. Wells Fargo Bank, Nat. Ass'n*, 546 F.3d 533, 540 (8th Cir. 2008); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F.Supp.2d 951, 961 (D. Minn. 2000).

The construction and effect of a contract is a question of law unless the contract is ambiguous.  *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). Contract language is unambiguous if it is not reasonably susceptible of more than one meaning, *Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 851 (8th Cir. 2008) (applying Minnesota law), and unambiguous contract language must be given its plain and ordinary meaning,  *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn.

1995).  Any interpretation of a contract that would render a provision meaningless or lead to a harsh or absurd result should be avoided.  *Brookfield Trade Center, Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).  However, words and phrases are not to be viewed in isolation.  *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn. 2003).  Rather, a contract is to be interpreted in accordance with the obvious purpose of the contract as a whole.  *Id.*

As noted above, the word "termination" itself is not defined in any of the agreements in question.  Kohler correctly observed in his arguments that there does not seem to be a precedential case directly on point.  Contract interpretation requires use of words' plain and ordinary meaning.  As an example, the analysis of the term provided by the Appellate Court of Illinois, giving the word "termination" its "common and generally accepted meaning" in an employment context, is well stated: "it means an end to employment and could mean a voluntary resignation, an involuntary termination or both."  *Willenson v. Miner, Barnhill & Galland, P.C.*, 2011 WL 9693620 at *3 (Ill. App. Ct. Apr. 14, 2011).  In the Employment Agreement, the parties used "termination" inclusively, indicating situations in which Hampton's employment could end included: by "mutual consent" between the parties (Employment Agreement § 16(a)), through an uncured breach of the agreement by Hampton (*id.* § 16(c)), or "for cause" following a determination by Milestone that Hampton had committed some type of misconduct or material breach (*id.* § 16(d)).

Because of this broad use, there is no single definition of "termination" that can be applied consistently throughout the contract, and the term's meaning must be ascertained

from its particular use within a clause. The only clause in the "Termination" section of the Employment Agreement that uses a permutation of "termination without cause" is 16(b), which is premised upon one party or the other initiating the end of Hampton's employment by giving notice to the other of an intention to "terminate without cause." (*Id.* 16(b).) This clause follows, and thus is distinguished from, the clause describing termination upon mutual consent. (*Id.* 16(a).)

Hampton's interpretation to the contrary finds no support in the language and purpose of both the Post-Closing Agreement and the Separation Agreement. The Post-Closing Agreement was drafted in anticipation of a change in company ownership and management, and provided the company assurances that crucial employees would stay on for the duration of a critical transition period while providing employees incentive to see that the company performed well in order to maximize their escrow payouts and assurances that they would not be let go by the new management without at least receiving substantial compensation. The language in Section 3 goes directly to these protections by stating that Hampton would still be eligible to receive his pro-rata portion of post-closing amounts despite not being employed by the company at the time of the payments if Kudelski "terminate[d] [Hampton's] employment without cause." (Post-Closing Agreement § 3.) The usage here reinforces the construction of "termination without cause" as a scenario in which Hampton's employment is ended by the action of one party, and further requires that the party taking that decision is *not* Hampton. In other words, he would be eligible to receive the payment if he was fired or laid off, but not if he quit.

Hampton of course argues against this construction and maintains that it was Kohler who breached their agreement. However, he argues that even under this construction of the contracts in question, any failure on his part to fulfill the contract would not justify a forfeiture the size of his pro-rata portion of the shares' value.

A condition precedent is an event that must occur before a party is obligated to perform a certain duty under a contract, and if the event required by the condition does not occur, there is no breach of contract when a promisor does not perform. *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 27 (Minn. 2018). It can be formed without any "particular code words." *Minnwest Bank Cent. v. Flagship Properties LLC*, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004). A contract party that has failed to perform a condition precedent after it has relied substantially on the expectation of an exchange forfeits its right to compensation in the agreed exchange. *enXco Dev. Corp. v. N. States Power Co.*, 758 F.3d 940, 946-47 (8th Cir. 2014). In cases where a condition precedent is not fulfilled, Minnesota courts recognize the doctrine of disproportionate forfeiture and will not enforce a condition precedent if it results in one party receiving "something for little or nothing." *Id.* at 947. "It is well established that forfeitures are not favored and will not be enforced when great injustice would be done and when the one seeking the forfeiture is adequately protected without the forfeiture." *Hideaway, Inc. v. Gambit Investments Inc.*, 386 N.W.2d 822, 824 (Minn. Ct. App. 1986). Forfeiture may be "fair and just" where enforcing agreements reached when "able counsel represented sophisticated parties." *enXco*, 758 F.3d at 947.

Before weighing the proportionality of a forfeiture, a court must first determine whether the failure to meet a condition precedent constituted a material breach. *Capistrant*, 916 N.W.2d at 31. If the court finds that the condition demanded was not material to the contract, the risk to be protected is weighed against the amount to be forfeited. *Id.* at 29. If "the occurrence of the condition is a material part of the agreement, then the proportionality analysis is not applied and the forfeiture cannot be prevented." *Id.*

A material breach "goes to the root or essence of the contract." *Skogberg v. Huisman*, 2003 WL 22014576, at *2 (Minn. Ct. App. Aug. 19, 2003). The Minnesota Court of Appeals has acknowledged that Minnesota caselaw has not clearly defined the term "material breach," but has noted that the Minnesota Supreme Court has found a breach that violated one of the primary purposes of a contract to be material. *Id.* at *3 (citing *Steller v. Thomas*, 45 N.W.2d 537, 542 (Minn. 1950)); *accord Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 921 (8th Cir. 2013). The purpose of the Post-Closing Agreement as a whole, and Section 3, entitled "Payment Conditioned on Employment," in particular, was to offer both parties predictability and protections throughout the transition period after Kudelski acquired Milestone. Hampton's early departure struck at the heart of this bargain, and as a consequence, his failure to meet the condition was material and this Court will not examine the proportionality of the forfeiture required.

Hampton seems also to argue, though not in so many words, that even if he did quit, he did not do so voluntarily so he should not be penalized for a failure to fulfill a condition of the agreement. If a party to a contract unjustifiably prevents the occurrence

of a condition precedent, their duty to perform is not excused.  *Minnwest*, 689 N.W.2d at

300.  Again, there is no set definition of "termination" in the parties' agreements.

Minnesota courts have frequently analyzed the circumstances under which employment

ends, though, in the context of employment law, and their analysis provides helpful

illustrations of the common understanding of terms.

Constructive discharge is a doctrine "that may be invoked by a plaintiff in some

employment-related actions to prove that, even though the plaintiff resigned from his or

her job, the defendant should be deemed to have made an adverse employment action."

*Coursolle v. EMC Ins. Grp., Inc.*, 794 N.W.2d 652, 660 (Minn. Ct. App. 2011).

Constructive discharge is established when a plaintiff proves that his or her employer's

illegal discrimination created intolerable working conditions and that the employer either

intended to force the employee to quit or could have reasonably foreseen that its conduct

would force the employee to quit.  *Id.*  Whether an employee's working conditions were

intolerable is judged by a "reasonable person" standard.  *Diez v. Minnesota Min. & Mfg.*,

564 N.W.2d 575, 579 (Minn. Ct. App. 1997).  This standard is objective, not based on a

plaintiff's subjective feelings, *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th

Cir. 1996), and an employee "may not be unreasonably sensitive to his working

environment," *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981).  A

reduction in pay or work under difficult conditions that do not target an individual worker

exclusively do not necessarily constitute constructive discharge.  *Allen*, 81 F.3d at 797.

Loss of childcare that forces an employee to leave their position *may* be considered

constructive discharge that would leave the employee eligible for unemployment

benefits, but only if the employer denies a request for accommodation. *Gonzalez Diaz v. Three Rivers Cmty. Action, Inc.*, 917 N.W. 2d 813, 814 (Minn. Ct. App. 2018). According to the definition found in Minnesota's unemployment-compensation statute, an employee is considered to have "quit" when "the decision to end the employment was, at the time the employment ended, the employee's." *Id.* at 819 (citing Minn. Stat. § 268.095 subd. 2(a) (2017)). Put differently, the "test for determining whether an employee has voluntarily quit is whether the employee directly or indirectly exercises a free-will choice to leave the employment." *Shanahan v. Dist. Mem'l Hosp.*, 495 N.W.2d 894, 896 (Minn. Ct. App. 1993). These examples comport with a common and generally accepted understanding of what it means to quit one's job versus being the object of an action to terminate employment. Under the record before the Court, it is clear that Hampton left his employment voluntarily at the time that he did, and that he was not forced by anyone at Kudelski to leave their employ before the November 2017 disbursement of post-closing funds.

Hampton's submissions to the Court support his contention that he indicated to Kudelski management he wanted to find a way to change his role at the company but not necessarily by leaving his employment. His own materials also show, however, that he expressed a willingness to leave before pending renewals of agreements with a major customer went through, placing their completion at risk, and that he and his counsel actively engaged in negotiations with Kudelski over his exit. While the notion of a termination without cause was discussed, this apparently took place in the course of the negotiation process that resulted in the final Separation Agreement. (See, e.g., Hampton

Aff. ¶ 17.)  Further, his comparison of his situation with that of Mark Thompson's is unsupported and even contradicted by his own exhibits, which show that the two left under agreements with different terms.  (*Id.*)  Significantly, the behavior and actions of Kudelski's management over the months leading up to Hampton's separation show that their priority was keeping Hampton with them in one capacity or another at least through the second renewal with their major customer, expected to take place in or around April 2017, past the date at which Hampton would have been eligible to receive payments for post-closing amounts were he still a Kudelski employee.  Hampton's employer did not force him out by asking him to travel or take on different tasks— while he personally found this undesirable, it does not rise to such a level that it could be viewed as objectively intolerable.

The Separation Agreement memorializes "[t]he parties' separation . . . without cause by either party."  (Separation Agreement ¶ C.)  It is adamant in its repeated use of the shared possessive term "the parties' separation" and its total avoidance of the phrase "termination without cause."  Through this agreement, Hampton was able to avoid unwanted travel and other responsibilities while still receiving significant lump sums and substantial wages, and Kudelski was able to quell any risk of Hampton's competing with the company and maintain stability through the transition period leading up to the renewal of an important deal with a major customer.

Taken together, it is clear that under the original Employment Agreement, "termination without cause" was an end to Hampton's employment that could be initiated by one party or the other and envisioned a scenario other than a mutual agreement to

separate, and that the Separation Agreement reflected a mutual agreement to separate. The latter was mutually beneficial to both parties and a reasonable replacement for their prior arrangement, and their negotiated contract should be enforced.

## CONCLUSION

The Court finds that as a matter of law, Hampton is not entitled to payment of a pro-rata portion of post-closing amounts. He was not employed by Kohler's company, Kudelski, at the time of the post-closing disbursements, nor was he terminated without cause. For these reasons, no genuine issue of material fact exists as to Hampton's claim of breach of contract, and summary judgment is granted in Kohler's favor.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Michael Kohler's Motion for Summary Judgment (Doc. No. [37]) is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 25, 2019                         s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge